[Cite as *State v. Davis*, 2022-Ohio-2607.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| BRANDEN J. DAVIS, | : | Case No. 22 CAA 01 0005 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Delaware County
                                  Court of Common Pleas, Case No.
                                  21CRI050244


JUDGMENT:                         Affirmed


DATE OF JUDGMENT:                 July 28, 2022


APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

MELISSA A. SCHIFFEL                   WILLIAM T. CRAMER
Delaware County Prosecuting Attorney  470 Olde Worthington Road, Suite 200
                                      Westerville, Ohio 43082
By: TYLER LANE
Assistant Prosecuting Attorney
Delaware Co. Prosecutor's Office
145 North Union St.
Delaware, Ohio 43015

*Baldwin, J.*

{¶1} Defendant-appellant Branden Davis appeals his conviction from the Delaware County Court of Common Plea for domestic violence.    Plaintiff-appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND CASE

{¶2} On May 6, 2021, the Delaware County Grand Jury indicted appellant on one count of domestic violence in violation of R.C. 2919.25(A), a felony of the fifth degree. At his arraignment on June 14, 2021, appellant entered a plea of not guilty to the charge.

{¶3} Subsequently, a jury trial commenced on December 2, 2021 The following testimony was adduced at trial.  B.P. is the mother of two children. Appellant is the father of her youngest child.

{¶4}  B.P. testified that she had known appellant a long time and that they had dated back in grade school. The two reconnected in September of 2020 and were boyfriend and girlfriend.

{¶5} B.P. testified that appellant moved into her house in October of 2020 and lived there on and off until April of 2021. She testified that appellant stayed at her house more than he was away from it.  In April of 2021, B.P. was pregnant with their son. According to her, the two got into a fight on April 12, 2021 and she told appellant to move his stuff out "because it wasn't going to work out." Trial Transcript at 156.  She testified that she saw appellant again on April 30, 2021 at his mother's house where he was living. When she saw appellant, he was crying and the two talked. They talked in part about the baby. B.P. testified that after a while, they left the house together to get lunch and then went to the bank.

{¶6} B.P. testified that at some point, appellant's happy mood switched and appellant started yelling at her and accusing her of having sex with his best friend, Dustin. She testified that she was friends with Dustin because of appellant and that she did not have sex with Dustin. Appellant then demanded to see her phone to see her text messages because he did not believe her denials. B.P. gave appellant her phone. She testified that while she was not concerned about appellant seeing her texts with Dustin, there were other communications on her phone that she thought might upset appellant. The communications were with appellant's ex-wife Amanda. When B.P. realized that the text messages to Amanda would upset appellant, she asked for her phone back. Appellant did not give it back.

{¶7} The two drove to appellant's mother's house. B.P. testified that she reached for her phone a couple of times, but appellant flinched and told her "don't F'ing touch" me. Trial Transcript at 163. Appellant kept scrolling through her phone and accused her of lying. When they got to the house, appellant ran out of the car and B.P. ran inside the house and told appellant's mother to call the police. Appellant's mother refused to do so. B.P. then went outside to follow appellant in an attempt to get her phone back. Appellant ran down the road yelling about B.P. cheating on him. His mother came outside the house and yelled at appellant to stop yelling. B.P. told appellant to call Dustin to verify that she was not cheating on appellant with him. Appellant tried, but the call was connecting though B.P.'s car, which was still running. B.P. turned off the car and they all went inside the house.

{¶8} B.P. sat behind appellant, who was on the couch. She testified that appellant kept scrolling through her messages and that appellant's mother, who was

observing, told him to give the phone back. B.P. reached both hands around appellant to grab the phone and appellant leaned back into her and she tightened her arms around his neck. Appellant then started twisting or swiveling to try to get B.P. off of him. As he swiveled to the right, B.P. released appellant and ended up on her knees on the floor. She testified that appellant was standing over her and at the two made eye contact and then appellant grabbed a fistful of her hair and shook her head so that it kept hitting the floor. She testified that it was a fast shaking and that appellant pulled a chunk of hair out of her head. Appellant was not saying anything and B.P. told appellant to stop. She testified that his mother yelled at appellant to stop.

{¶9} B.P. then grabbed appellant's hands and he let go, ran out of the house and smashed her phone against the driveway three or four times. B.P. testified that appellant then ran to the front door and tried to come in, but his mother kept locking the door as he was trying to unlock it. Appellant then ran to the back door, but his mother kept locking the door. While appellant was outside, B.P. used his mother's phone to call 9-1-1. The call was played to the jury. During the call, B.P. told the dispatcher that appellant had beat the shit out of her and tore out her hair and that while she did not need a medic, she needed someone to arrest appellant. B.P. said that appellant was flipping out and had smashed her phone. On a second call, B.P. said that appellant had "fucked my ass up", ripped out her hair and was trying to get into the house. B.P. also said that appellant had her phone and accused him of being a drug addict.

{¶10} After the ambulance arrived, B.P. was taken to the hospital where she spoke with law enforcement. She testified that she had a huge bald spot and that the

area was painful for a few days. She also testified that she had a bad headache from her head hitting the floor.

{¶11} On cross-examination, B.P. testified that at the time of the incident, they were not living together anymore and were not in a relationship anymore. She had not yet had their baby and they did not have any other children in common. During the time that appellant primarily stayed with her from October until he moved out on April, 12 2021, B.P. paid the majority of the bills and her name was the only name on the lease. At the time, B.P. was married to R.P. whose name appears on the baby's birth certificate because under Ohio law, because she was legally married to him, he was presumed to be the father. B.P. admitted that other than the bald spot, she had no other injuries. B.P. testified that she went to the hospital on the suggestion of the EMT to make sure that the baby was safe. On cross-examination, B.P. admitted that she had a second phone at the mother's house, although she testified that it did not work. She testified that she wrapped her arms around appellant's neck after he leaned back while she was reaching for her phone so that she did not fall on her stomach.

{¶12} Charm Johnson, a deputy with the Delaware County Sheriff's Office, testified that she got involved in the situation after hearing a radio call describing appellant and saw him on the road. When she asked appellant if he was Davis, he responded yes. Appellant was cooperative and followed her directions. He got into her cruiser and Deputy Johnson went to appellant's mother's house to assist the medics. She testified that she stayed at her cruiser along with appellant once the medics went inside. Deputy Johnson had appellant give her a written statement which, she testified, was partial. Her body camera recorded their conversation and was played for the jury.

{¶13} On cross-examination, Deputy Johnson testified that appellant's story did not change and that "[i]t was always, she was shoving me." Trial Transcript at 230. Appellant said that multiple times. Deputy Matthew Jarvi of the Delaware County Sheriff's Office testified that he went to the scene of the incident and that B.P. was sitting on the couch "holding a large wad of hair in one of her hands and was fairly hysterical at that point while speaking to the medics." Trial Transcript at 240. He did not talk to B.P., but learned from other Deputies what appellant and B.P. had said. The decision was made to arrest appellant for domestic violence. Appellant was taken to the jail. According to Deputy Jarvi, he did not observe any injuries on appellant and appellant did not indicate that he had any injuries. He testified that while appellant, in his statement, stated that he had been choked by B.P. and was acting in self-defense, photos taken of appellant's neck and eyes did not show any symptoms of strangulation or choking type of injury.

{¶14} On the body camera videos, appellant admitted to taking B.P.'s phone and refusing to give it back, but said that he was not touching her. He said that she had handed him her phone and told him that he would not like what was on it because she was talking badly about him. Appellant said that B.P. would not let him out of the car until they got to his mother's house and that B.P. had had him in a choke hold, causing him to fear for his life. Appellant claimed that he did not do anything to B.P. over her cheating, but wanted her to leave him alone. He indicated that he knew that she was pregnant with his child.

{¶15} At the conclusion of the evidence and the end of deliberations, the jury, on December 2, 2021, found appellant guilty of domestic violence. The jury specifically found that appellee had proved beyond a reasonable doubt that appellant knew that B.P. was pregnant at the time of the crime. As memorialized in a Judgment Entry filed on

January 19, 2022, appellant was sentenced to a mandatory prison term of nine (9) months.

{¶16} Appellant now appeals, raising the following assignments of error on appeal:

{¶17} "I. THE WEIGHT OF THE EVIDENCE DID NOT SUPPORT THE DOMESTIC VIOLENCE CONVICTION."

{¶18} II. THE WEIGHT OF THE EVIDENCE DOES NOT SUPPORT A FINDING THAT THE PROSECUTION DISPROVED SELF-DEFENSE."

I, II

{¶19} Appellant, in his two assignments of error, challenges his conviction for domestic violence on manifest weight of the evidence grounds.

{¶20} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶21} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and

credibility of each witness, something that does not translate well on the written page."

*Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

{¶22} Appellant, in the case sub judice, was convicted of domestic violence in violation of R.C. 2919.25(A). Such section states that "No person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25 (F)(1) states as follows: "Family or household member" means any of the following:

{¶23} (a) Any of the following who is residing or has resided with the offender:

{¶24} (i) A spouse, a person living as a spouse, or a former spouse of the offender;

{¶25} (ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

{¶26} (iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

{¶27}        (b) The natural parent of any child of whom the offender is the other natural
               parent or is the putative other natural parent.

{¶28} R.C. 2919.25 (F)(2) states that "Person living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.

{¶29} Appellant argues, in part, that the weight of the evidence does not support a finding of cohabitation and that, therefore, his conviction for domestic violence is against the manifest weight of the evidence. Appellant notes that B.P. testified that appellant moved in with her in October of 2020, but admitted that he was only staying on and off

and would move out and move back in every couple of weeks and that there was very little sharing of financial responsibilities.

**{¶30}** However, there was evidence before the jury that appellant had impregnated B.P. and was the natural father of her child. B.P. testified that appellant was the father of her child because she had not had sex with anyone else. Appellant indicated to law enforcement that he knew that B.P. was pregnant with his child. Moreover, there was testimony that appellant and B.P. were dating and living together for a majority of a six-month period, shared some expenses and had consortium within five years prior to the date of the alleged commission of the act in question. Based on the foregoing, we find that the jury did not lose its way in convicting appellant of domestic violence.

**{¶31}** Appellant also argues that the weight of the evidence does not support a finding that appellee disproved self-defense. In the case sub judice, the jury was instructed that evidence was presented at trial that may support a finding of self-defense and that the prosecution had the burden of proving beyond a reasonable doubt that appellant did not use force in self-defense. R.C. 2901.05(B)(1). The jury was also instructed that to disprove self-defense, the prosecution had to prove one of four elements: (1) appellant was a fault for creating the situation giving rise to the events; (2) appellant did not have reasonable grounds to believe he was in imminent danger of bodily harm; (3) appellant did not have an honest believe that he was in imminent danger of bodily harm; or (4) appellant used unreasonable force. *State v. Lawyer,* 5th Dist. Licking No. 2018 CA 00030, 2019-Ohio-597, ¶ 29. Trial Transcript at 310-311.

**{¶32}** We concur with appellee that appellant could not have reasonable grounds or an honest belief that he was in imminent danger of bodily harm and that appellant used

unreasonable force when he began shaking B.P.'s head and pulled a clump out of her hair.  B.P., who was four-and-a-half months pregnant at the time, testified that after she was thrown off of appellant, she was on her hands and knees on the floor  while he was standing up looking down at her. She testified that after they made eye contact, appellant grabbed her hair and shook her head, causing B.P.'s head to hit the floor.  Only when she was on her hands and knees on the ground did appellant begin his assault. Based on the foregoing, we find that the disproval of appellant's claim of self-defense was supported by sufficient evidence and not against the manifest weight of the evidence.

{¶33}  Appellant's two assignments of error are, therefore, overruled.

{¶34}  Accordingly, the judgment of the Delaware County Court of Common Pleas is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Wise, John, J. concur.